# EXHIBIT A

STATE OF NEW YORK
SUPREME COURT: COUNTY OF ERIE

JOSEPH T. FLANAGAN
54 Lorna Lane
Tonawanda, New York 14150

      Plaintiff,                      **SUMMONS**

vs.                                         Index. No. _____

CORECIVIC, INC. dba CORE CIVIC
5501 Virginia Way, Suite 110
Brentwood, Tennessee 37027

      Defendant.

**TO THE ABOVE-NAMED DEFENDANT**:

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiffs' Attorneys within twenty (20) days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The bases of the venue designated, Erie County, are the Plaintiff's principal residence, the location of the acts complained of, and the location where Defendant did or transacted business in New York.

Dated: Buffalo, New York
June 17, 2024

ZDARSKY, SAWICKI & AGOSTINELLI LLP

By: *Gerald T. Walsh*
Gerald T. Walsh
Attorneys for Plaintiff
1600 Main Place Tower
350 Main Street
Buffalo, New York 14202
(716) 855-3200
gtwalsh@zsalawfirm.com

STATE OF NEW YORK
SUPREME COURT: COUNTY OF ERIE

JOSEPH T. FLANAGAN
54 Lorna Lane
Tonawanda, New York 14150

      Plaintiff,     **VERIFIED COMPLAINT**

vs.             Index. No. _____

CORECIVIC, INC. dba CORE CIVIC
5501 Virginia Way, Suite 110
Brentwood, TN 37027

      Defendant.

  Plaintiff Joseph Flanagan ("Flanagan"), by and through his attorneys, Zdarsky, Sawicki & Agostinelli LLP for his Verified Complaint against Defendant CoreCivic, Inc., alleges as follows.

  1. At all relevant times, Flanagan was and remains a resident of the State of New York, County of Erie, Town of Tonawanda.

  2. Defendant CoreCivic, Inc. is a foreign corporation organized and existing, upon information and belief, under the laws of the State of Maryland, and is authorized to do business or does business in the State of New York, or transacts business in the State of New York, where it employs more than four persons.

  3. Flanagan was employed as a CoreCivic, Inc. ("CCA") correctional officer contractor stationed primarily at the United States Marshal's Service ("USMS") Office at the United States District Court for the Western District of New York ("WDNY") in Buffalo, New York.

  4. Flanagan worked for over 30 years in law enforcement, attaining the rank of Captain, prior to working as a CCA contractor for USMS.

5. Flanagan, born in 1958, started working for CCA in October 2017, when Flanagan was 59 years old.

6. Flanagan's work time at CCA was usually split 95% at the USMS's WDNY Office in Buffalo, New York and 5% in or travelling to and from Youngstown, Ohio, where CCA's Northeast Ohio Correctional Center ("NEOCC") is located.

7. While working at the USMS, there were numerous, constant derogatory references to Flanagan's age: e.g., ancient, the old guy, old timer, dinosaur, older than salt.

8. Such comments were made by USMS Deputies, mostly by USMS Deputy Ian Walton, frequently, almost daily, in the course of routine conversation.

9. USMS Supervisor Lee Eckenrode referred Flanagan to an ageist, racist internet site ("Uncle Ruckus"), and Eckenrode called Flanagan "Big Dick Daddy"

10. In February 2022, Michael Reese, much younger than Flanagan, who is related to Erie County Sheriff John Garcia's First Deputy Superintendent Sandra Amoia (Reese's aunt), while working a Department of Justice USMS part-time contract job on the Federal Prisoner's detail at Mount St. Mary's Hospital in Lewiston, New York, asked Flanagan about Flanagan's age and his pay and benefits for his CCA position.

11. Both Michael Reese and Flanagan had worked an additional part-time DOJ USMS job as a contract guard for transport or at medical facilities where federal prisoners were treated, about 4 or 5 times a year.

12. The Erie County Sheriff's Department ("ECSD") entered into a contract for detention services with USMS after a long period with no contract during former Sheriff Tim Howard's tenure.

13. Upon information and belief, in connection with the ECSD and USMS Contract,

Michael Reese was slotted to take Flangan's CCA job, to work with USMS.

14. While Ian Walton ran side businesses out of the Marshal's office while collecting full salary and benefits, a fact known to USMS, but no corrective action was taken.

15. Ian Walton and Flanagan exchanged words in January 2022 about their respective job duties and performance.

16. On April 14, 2022, via certified mail, received by CCA on April 17, 2022, Flanagan filed a grievance with CCA regarding a letter of termination, which Flanagan only received on or within a few days before April 14, 2022, even though CCA's letter was dated effective March 14, 2022.

17. CCA told Flanagan he was being investigated based on failure to call for back-up prior to entering a cell to take control of an unruly prisoner.

18. CCA then told Flanagan to report for duty to Youngstown, Ohio, for less money than Flanagan's Buffalo position paid.

19. Flanagan told CCA he could not afford to move to Youngstown for less money, but that he would accept a position in or near Buffalo.

20. CCA told Flanagan that CCA did not have any positions for Flanagan near Buffalo. Flanagan was then placed on leave and told that CCA would conduct an investigation.

21. CCA's alleged reason for termination of Flanagan's position then changed, with CCA alleging that Flanagan had sworn at a deputy, which, based on the circumstances detailed below, Flanagan believed to be a pretext for age discrimination and retaliation.

22. Flanagan applied for and received unemployment benefits based on CCA's initial statement to Flanagan that CCA would only re-assign Flanagan for duty in Youngstown, Ohio and that no positions were available in or near Buffalo.

3

23. On June 20, 2022, Flanagan had a thirty-minute telephone conference with CCA NEOCC CCA Warden David Bobby and CCA Human Resources Manager Christine Hittle.

24. Warden Bobby told Flanagan he was not sure why Flanagan had filed a grievance and to go ahead and fill him in.

25. Flanagan told Warden Bobby that after the initial surprise over receiving a termination letter, Flanagan believed CCA's actions were motivated by unlawful discriminatory and political reasons and not poor job performance or a poor disciplinary record.

26. An unruly prisoner incident occurred in February 2022, after an inmate was banging his head against his cell walls at the WDNY Court lock-up and was flooding the cell.

27. After calling for backup, Flanagan entered the cell while waiting for back up to arrive, which they did, 4 or 5 seconds after Flanagan went in.

28. Flanagan told Warden Bobby that Flanagan had a couple of conversations with USMS Supervisor Lee Eckenrode over the February 2022 incident, and another conversation with Deputy Chief Marshal Rebecca Smith.

29. Flanagan acknowledged his understanding of concerns expressed by Eckenrode and Smith in the conversations regarding the February 22 incident and said he that would wait for the arrival of backup in the future.

30. Nevertheless, CCA placed Flanagan on paid administrative leave effective February 17, 2022, pending further investigation.

31. Flanagan told Warden Bobby that at no time during this period was there any mention of any heated conversation with Ian Walton or anyone else at USMS, though CCA later stated, in a termination letter, that Flanagan was being terminated for swearing.

32. In or around 2020, USMS Chief Deputy Rebecca Smith called Flanagan in to

4

Seek his opinion concerning the operation of the office and a run-down of Flanagan's opinions regarding each deputy, based on Flanagan's prior experience as a law enforcement supervisor.

33. Flanagan advised Deputy Chief Smith that certain deputies were getting away with significant violations of workplace policy and procedure and that if she did not start to take corrective action, Deputy Chief Smith would be inviting chaos and it would be very difficult to "rein them in" again.

34. Flanagan suggested to Deputy Chief Smith that she should begin taking progressive discipline measures against violators, beginning with verbal counseling sessions, followed by written warnings, and then formal charges, with time off or termination.

35. At Chief Deputy Smith's direction, Flanagan spoke frankly with her about several issues at USMS WDNY, including discussions about Ian Walton.

36. Flanagan verily believes he was targeted for retaliation based on the comments solicited from him by USMS Deputy Chief Smith.

37. Flanagan told Warden Bobby about Michael Reese, who was placed at Flanagan's desk after Flanagan was placed on paid leave, and Michael Reese's connection to ECSD First Deputy Superintendent Sandra Amoia, in the context of Michael Reese's questions to Flanagan during a Niagara County prisoner detail, in which Reese was probing Flanagan for CCA pay and benefits information.

38. Flanagan told Warden Bobby about the conversations with USMS Chief Deputy Marshal Rebecca Smith and Marshal Charles Salina regarding the operation of the USMS office and Flanagan's assessment of personnel in which problems with USMS personnel had been identified and discussed.

39. Warden Bobby said he did not believe Flanagan had taken responsibility for his

actions and that this represented a "slow burner" which culminated with the prisoner incident.

40. Flanagan told Warden Bobby he had acknowledged his responsibilities and that he was convinced that he was fired because USMS wanted someone younger in his job.

41. Flanagan also told Warden Bobby about USMS Supervisor Lee Eckenrode's warning to the USMS workforce to offer Flanagan help or they would run the risk of losing him and having to take on all of his work.

42. Flanagan also received an award from USMS – an appreciation plaque presentation by the Marshal.

43. Flanagan told Warden Bobby that Flanagan had received nothing but praise and positive feedback for his work and had no disciplinary record whatsoever.

44. Flanagan told Warden Bobby termination was grossly unfair and that he was not the problem.

45. Though Warden Bobby told Flanagan he had taken copious notes and would be getting back with Flanagan, Flanagan never heard back from CCA regarding his grievance.

### AS AND FOR A FIRST CAUSE OF ACTION

46. Plaintiff realleges and repeats the allegations set forth in paragraphs 1 through 45 above as if fully set forth herein.

47. Flanagan was fired and not re-assigned in retaliation because he reported unlawful age discrimination and retaliation to Defendant CCA he reasonably believed to be in violation of state and federal law.

48. Flanagan's reports to Defendant CCA related to or potentially involved Flanagan's reasonable belief that Defendant's activity, policy, or practice violated one or more of the following: a New York (and Federal) law, rule, regulation, executive order, rule or regulation

derived from an executive order, or judicial or administrative decision rule or order against unlawful discrimination.

49. After Flanagan reported what he believed to be illegal discrimination Defendant CCA retaliated against Flanagan, refused to permit him to return to work, and discharged him from his employment.

50. By virtue of the foregoing, Defendant CCA violated New York's Whistleblower Law, New York Labor Law Section 740.

51. Flanagan has suffered damages based on Defendant CCA's violation of New York Labor Law Section 740.

52. Flanagan is entitled to relief under New York Labor Law Section 740, including reinstatement to the same or an equivalent position, reinstatement of his full fringe benefits and seniority rights, and damages in an amount which exceeds the jurisdictional limits of all lower courts, including compensation for lost wages and benefits, front pay in lieu of reinstatement, a civil penalty of up to $10,000.00, together with reasonable costs and attorneys' fees associated with bringing the instant action.

## AS AND FOR A SECOND CAUSE OF ACTION

53. Plaintiff realleges and repeats the allegations set forth in paragraphs 1 through 52 above as if fully set forth herein.

54. Defendant CCA targeted Flanagan and terminated Flanagan's employment because of his age, and in retaliation for speaking up and reporting age discrimination.

55. Defendant intentionally discriminated against older workers, like Flanagan, by firing older employees to make room to hire younger employees to be assigned to USMS WDNY.

56. Upon information and belief, the conduct, and communications of Defendant CCA and subsequent termination of Plaintiff Flanagan's employment adversely affected, and substantially interfered with, the terms and conditions of Plaintiff's employment, in violation of New York Executive Law §296.

57. As a direct and proximate result of the unlawful employment practices and the Defendant CCA's disregard for Plaintiff's rights and sensibilities, Plaintiff Flanagan lost and will continue to lose substantial income, including but not limited to, wages, social security, fringe benefits, pension and seniority benefits, and other benefits due him.

58. As a further direct and proximate result of Defendant CCA's unlawful employment practices, Plaintiff Flanagan has suffered the indignity of discrimination, the invasion of his right to be free from discrimination, humiliation, and mental anxiety.

59. As a further direct and proximate result of Defendant CCA's unlawful employment practices, Plaintiff Flanagan has suffered mental anguish, outrage, severe anxiety about his future and his ability to support himself and his family, harm to his employment prospects and earning capacity, embarrassment among friends and co-workers, damage to his reputation, disruption of his personal life, and loss of enjoyment of the pleasures of everyday life.

60. As a result of Defendant's violation of the New York Executive Law, on account of age discrimination and retaliation for opposing age discrimination, plaintiff has suffered damages in an amount which exceeds the jurisdictional limit of all lower courts.

**WHEREFORE,** Plaintiff demands judgment against Defendant, as follows:

A. Compensatory Damages in an amount to be determined at trial;

B. Punitive Damages in an amount to be determined at trial;

C. A Civil Penalty of up to $10,000.00 per Labor Law Section 740;

D. Reasonable attorneys' fees associated with bringing this action;

E. The costs and disbursements of this action;

F. Such other and further relief as this court deems just and proper

Dated: Buffalo, New York
November 9, 2023

                         **ZDARSKY SAWICKI & AGOSTINELLI LLP**

By: _/s/ Gerald T. Walsh_
Gerald T. Walsh
*Attorneys for Plaintiff Joseph T. Flanagan*
1600 Main Place Tower
350 Main Street
Buffalo, New York 14202
(716) 855-3200
gtwalsh@zsalawfirm.com

## VERIFICATION

STATE OF NEW YORK )
COUNTY OF ERIE ) ss.:

    Joseph T. Flanagan, being duly sworn, deposes and says that he is the Plaintiff named in the within entitled action; that he has read the foregoing Complaint and knows the contents thereof; and that the same is true to his own knowledge, except as to any matters therein stated to be alleged upon information and belief, and as to those matters, he believes them to be true.

*Joseph T. Flanagan*
Joseph T. Flanagan

Subscribed and sworn to before
me this 9th day of November 2023

*Gerald T. Walsh*
Notary Public

GERALD T. WALSH
Notary Public, State of New York
Qualified in Erie County
My Commission Expires Apr. 4, 2024

10